**Joseph Roosevelt GREMILLION**

v.

**Salvadore J. RINAUDO et al.**

**Civ. A. No. 70–175.**

United States District Court,
E. D. Louisiana,
Baton Rouge Division.

March 30, 1971.

Alfred E. Mitchell, Plaquemine, La., for petitioner.

Leon A. Picou, Jr., St. Francisville, La., for defendant, Salvadore J. Rinaudo.

Joseph W. Cole, Jr., Port Allen, La., for defendants, Pointe Coupee Parish Executive Committee, Isadore G. Olinde, Chairman, and Clerk of Court, and its members.

WEST, Chief Judge:

This action, based primarily on the 1965 Voting Rights Act, 42 U.S.C.A. § 1971 et seq., is brought to set aside the results of the Democratic Party primary election held August 15, 1970, to select a Democratic nominee for school board member from Ward 9, Pointe Coupee Parish (County), Louisiana. The plaintiff, Joseph Roosevelt Gremillion, a Negro, and one of two candidates competing for the Democratic nomination, received a total of 1089 votes in the primary election. His sole opponent, Mr. Salvadore J. Rinaudo, one of the defendants herein, received a total of 1116 votes, winning by a margin of only 27 votes. Mr. Rinaudo was therefore certified by the Pointe Coupee Parish Democratic Executive Committee as the duly elected Democratic nominee for school board member in the then forthcoming general election. Subsequent thereto, Mr. Rinaudo was, in fact, elected to the Pointe Coupee Parish School Board in the general election held November 3, 1970. Plaintiff asks in this suit that the results of the primary election be set aside, and as reasons therefor alleges:

(1) that a number of "white voters who had previously cast absentee ballots were observed in and about various precinct polling places on election day;

(2) that one Tammie J. Fulmer, one of the registered Democratic voters residing in the parish, was allowed to vote twice, first by casting an absentee ballot, and then again on the day of the election itself by voting in one of the precinct voting machines;

(3) that the total number of votes cast at Precinct 1 of Ward 9 was not verified by all of the voting commissioners assigned to that precinct;

(4) that the voting commissioners began counting the absentee ballots before the polls closed on election day;

(5) that one Jeff David, a poll watcher appointed by Mr. Rinaudo in conformity with LSA–R.S. 18:339–341, "tampered with voting tabulation sheets" throughout the election; and

(6) that the Chief-of-Police of New Roads, Louisiana (the parish seat), Mr. Kerby Aguillard, who was neither a voting commissioner nor a poll watcher, assisted both white and Negro voters in the voting machines while attired in his police uniform, and on its face, such assistance amounts to coercion and intimidation in violation of the 1965 Voting Rights Act and the Fifteenth Amendment.

An earlier state court action in which plaintiff had also sought to contest the results of the primary election on grounds similar to those urged here was dismissed on exceptions of misjoinder of parties and failure to state a cause of action. See Gremillion v. Rinaudo, 240 So.2d 237 (La.App. 1st Cir. 1970). Dissatisfied with the outcome of that suit, plaintiff turned to this Court and filed the present action. Made defendants in this case are: (1) Mr. Salvadore J. Rinaudo, plaintiff's sole opponent in the primary election, (2) the parish Democratic Executive Committee together with each of the individual members of the Committee, some seventeen in number, and (3) Mr. Isadore G. Olinde in the dual capacity of Chairman of the Democratic Executive Committee and Clerk of Court for Pointe Coupee Parish. Each of the defendants above named was also a party defendant in plaintiff's unsuccessful state court action.

Plaintiff alleges jurisdiction under the Voting Rights Act of 1965, Title 42 U.S.C.A. § 1973, Title 42 U.S.C.A. § 1971(d), under Title 28 U.S.C.A. § 1343(4), and under the Fourteenth and Fifteenth Amendments to the United States Constitution.

This case is before the Court now on (1) motion of all defendants to dismiss the suit for failure to state a claim upon which relief can be granted and on (2) motion of the defendant Democratic Executive Committee and defendant Isadore G. Olinde to dismiss the suit as to them for misjoinder of parties. We need reach only the first of these motions. Hearing on these motions was held before this Court on December 4, 1970, at which time we asked to be furnished with a copy of the proceedings previously initiated by plaintiff in the state court. Counsel for all parties were accorded fifteen days within which to file additional memoranda or evidence as they saw fit. None of the parties, however, elected to further amplify their respective positions. After carefully studying the record in this case together with the opinion previously rendered by the state appellate court, Gremillion v. Rinaudo, supra, it is now the opinion of this Court that plaintiff's complaint has failed to state a claim upon which relief might be granted against any of the named defendants. The case will be dismissed in its entirety.

When reviewing the merits of a motion to dismiss under Rule 12(b), and more particularly a motion to dismiss for failure to state a claim under Rule 12(b) (6), we are required to give plaintiff the benefit of the doubt and treat the challenged complaint in the light most favorable to him. The allegations of his complaint, therefore, are taken as true. See, Jenkins v. McKeithen, 395 U.S. 411, 421–422, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969); 5 Wright & Miller, Federal Practice and Procedure (Civil), § 1357), p. 594, n. 46 (1969). This must be done because "[i]t is axiomatic that a motion to dismiss an action for failure to state a claim upon which relief can be granted admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts." Ward v. Hudnell, 366 F.2d 247, 249 (5th Cir. 1966). The inquiry then is simply one of determining whether or not plaintiff's allegations of wrongdoing are, as a matter of law, encompassed within the terms of the statute upon which he relies for subject matter jurisdiction. In this case, we think not.

There can be no doubt of course but that the statute upon which plaintiff relies, the 1965 Voting Rights Act, prohibits any practice or procedure which either by design or effect operates to deny or impair the right to vote in any election, federal or state, solely because of an otherwise qualified elector's "race, color, or previous condition of servitude." 42 U.S.C.A. § 1971(a) (1); United States v. McLeod, 385 F.2d 734 (5th Cir. 1967); Comment, Federal Protection of Voting Rights, 51 Va.L. Rev. 1051 (1965). It has been clear since South Carolina v. Katzenbach, 383

U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) approved the literacy test ban of the Voting Rights Act of 1965 that congressional legislation to enforce the guarantees of the Civil War Amendments is constitutionally permissible. But this enforcement power is not unlimited, as was pointed out in Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 266–267, 27 L.Ed.2d 272 (1970), the recent 18 year old voter case:

> " * * * First, Congress may not by legislation repeal other provisions of the Constitution. Second, the power granted to Congress was not intended to strip the States of their power to govern themselves or to convert our national government of enumerated powers into a central government of unrestrained authority over every inch of the whole Nation. Third, Congress may only 'enforce' the provisions of the amendments and may do so only by 'appropriate legislation.' Congress has no power under the enforcement sections to undercut the Amendments' guarantees of personal equality and freedom from discrimination, * * * "

Thus, as a general proposition, Congress has no authority to interfere with most state regulations of the "local" electoral process. But, because of the specific authority of the Thirteenth, Fourteenth, and Fifteenth Amendments, it is clear that Congress has the authority to attempt to remedy racial discrimination, within certain limitations.

An examination of the legislative history of the Voting Rights Act of 1965 confirms that this was the purpose of the Act. According to the 1965 U.S. Code Congressional and Administrative News, p. 2437, the purpose of the Voting Rights Act was to enforce the Fourteenth and Fifteenth Amendments. And an examination of the language of Title 42 U.S.C.A. § 1971 reveals, in addition, that Congress used the same language in that statute as that which appears in the Fifteenth Amendment, i. e., securing to all citizens the right to vote without distinction of "race, color, or previous condition of servitude."

■ Therefore, it is the opinion of this Court that the voting rights statutes and the Fourteenth and Fifteenth Amendments to the United States Constitution are directed against discrimination. And, except for the prohibition of specific devices, such as the literacy test, these statutes do not purport to spell out the procedure to be employed in the conduct of "local" elections in the several states. This prerogative remains, essentially, reserved to the several states. See Title 42 U.S.C.A. § 1973c; Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 443, 27 L.Ed.2d 476 (1971) (dissenting opinion). Furthermore, an examination of the jurisprudence in this area reveals that the federal courts have protected voters from an actual or potential denial or abridgement of their right to vote only where the basis for the infringement was racial discrimination. Here, the only allegations in the complaint which indicate discrimination are (1), (2), and (6); the others assert nothing to suggest that persons otherwise qualified by law to vote were denied that right because of their race, color, national origin, or previous condition of servitude. They complain of incidents that, even if true, are clearly ministerial errors and omissions on the part of the local official charged with conduct of the election. And this area is simply not covered by the 1965 Voting Rights Act nor otherwise preempted either by the United States Constitution or by federal legislation. The remedy for such errors and omissions lies in the state, not federal courts. The state procedural device for raising such issues is an election contest suit under LSA–R.S. 18:364, the very relief originally sought by plaintiff Gremillion.

■ Plaintiff's first and second allegations both concern the presence around the polling places on election day of white voters who had previously cast

absentee ballots. The first allegation states generally that such voters were observed and the second allegation names a specific individual, Tammie J. Fulmer, who was allowed to vote twice. As for the specific allegation with regard to Mr. Fulmer, this error was corrected by the Pointe Coupee Parish Democratic Executive Committee prior to the state court suit. And there is no basis for concluding that there was any pattern or practice which allowed such double voting, except for the unsupported implication of the complainant's first allegation. There is no specification of the number or identities of any other persons, and the complainant was unable, either in the state or in the federal court, to introduce any evidence to substantiate this charge.

The only other allegation which can be construed as asserting a federal claim is the one involving the "assistance" of the Chief-of-Police of New Roads, Louisiana. The complaint itself, however, shows that the police officer assisted "both whites and blacks in the voting machine." Moreover, at the trial of this matter in the state court, plaintiff was able to produce only one Negro witness who recalled having received such assistance and that witness testified categorically that his vote was not influenced by the officer. We are unable to perceive why assistance from a uniformed police officer, without anything more, should on its face be held to be coercion and intimidation in violation of the 1965 Voting Rights Act. To do so would be to create an unwholesome presumption that any such assistance is inherently unlawful. This we decline to do. Furthermore, this case was fairly heard and decided adversely to the plaintiff by the state court. Under the facts of this case, there is simply no federal question presented to this Court.

The defendants' motion to dismiss this action for failure to state a claim upon which relief can be granted is granted.